UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES


| UNITED STATES OF AMERICA, | ) | CASE NO: 2:18-MJ-02255 |
|---|---|---|
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| LEV ASLAN DERMEN, | ) | Tuesday, August 28, 2018 |
| A/K/A LEVON TERMENDZHYAN, | ) | |
| | ) | (4:34 p.m. to 6:16 p.m.) |
| Defendant. | ) | |


DETENTION HEARING

BEFORE THE HONORABLE GAIL J. STANDISH,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:            RICH ROLWING, ESQ.
                         LESLIE GOEMAAT, ESQ.
                         U.S. Attorney's Office
                         312 North Spring Street
                         Los Angeles, CA 90012


For Defendant:            MARK J. GERAGOS, ESQ.
                         Geragos & Geragos
                         Historic Engine Company No. 28
                         644 S. Figueroa St.
                         Los Angeles, CA 90017

Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         E. Carson

Transcribed by:           Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, TX 78480-8668
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

1                              <u>INDEX</u>

2   <u>GOVERNMENT'S WITNESS</u>      <u>DIRECT</u>      <u>CROSS</u>      <u>REDIRECT</u>

3   **TYLER HATCHER**               **23**        **41**        **62**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **Los Angeles, California; Tuesday, August 28, 2018; 4:34 p.m.**

2                    **(Call to order)**

3         **THE CLERK:** Calling Case Number 18-2255-MJ, *USA*

4    *versus Lev Aslan Dermen* (indisc.) counsel please state your

5    appearances.

6         **MR. GERAGOS:** Good afternoon, your Honor, Mark

7    Geragos, G-E-R-A-G-O-S, appearing with Mr. Termendzhyan, who's

8    present in custody.

9         **THE COURT:** Custody, good afternoon, Mr. Geragos.

10        **MR. ROLWING:** Good afternoon, your Honor, Richard

11   Rolwing, R-O-L-W-I-N-G, and Leslie Goemaat, G-O-E-M double "A"

12   T, with the --

13        **THE COURT:** M, double "A," T.

14        **MR. ROLWING:** -- with the Department of Justice on

15   behalf of the Government.

16        **THE COURT:** DOJ, okay. Good afternoon, everybody.

17   You have the file, Ms. Carson, or did I leave it in my

18   chambers?

19        **(Judge/Clerk confer)**

20        **THE COURT:** Oh, goodie. Pardon me, ladies and

21   gentlemen.

22        **(Pause from 4:35 p.m. to 4:39 p.m. while Judge retrieves**

23   **file)**

24        **THE COURT:** My courtroom deputy just wants me to get

25   exercise. Our chambers are about a quarter of a mile around

1   the building, so I think that she was just making sure that I'm

2   getting my exercise for the day.  All right, let's do this

3   again.  Are we still on the record?

4          **MS. SPEAKER:**  Yes.

5          **THE COURT:**  Okay, all right.  My recollection now is

6   that we were here, we continued the detention hearing because

7   Mr. Geragos was not in court, he had someone specially

8   appearing for him --

9          **MR. GERAGOS:**  That's correct.

10          **THE COURT:**  -- the first day so we didn't do either

11   the detention hearing or any of the further proceedings for

12   this out-of-district case.  So the Government has made a motion

13   for detention that I had in the file previously.  What I

14   usually do is ask the Government to make its proffer in its

15   opening argument as to the issue of detention.

16          **MR. ROLWING:**  Thank you, your Honor.  Rich Rolwing

17   again, your Honor, thank you.  Mr. Dermen, which is a recent

18   name change, formerly known as Levon Termendzhyan, is charged

19   in the District of Utah with significant serious felonies of

20   money laundering, conceal and disguise, I believe four counts

21   carrying with the maximum statutory penalty of 80 years.  He is

22   alleged to have schemed with his two codefendants in this money

23   laundering in defrauding the United States of over $500

24   million.  The evidence will show that he is involved in at

25   least 456 million of those fraud proceeds being received by his

1   co-defendants and shared with Mr. Termendzhyan.  And the

2   attempt was in excess of $1.1 billion.  These are very serious

3   offenses carrying with them guidelines that approach, if not

4   exceed, the table.  He's looking at life in prison.

5          It's our burden to show by merely a preponderance at

6   this stage that he is a risk of flight.  Mr. Termendzhyan, and

7   I will proffer the evidence that is submitted through the

8   Pretrial Services report, has not just significant ties to

9   Turkey but has lived there, resides there, changed his name as

10  it states to a Turkish name so that he could be more accepted

11  in that country, and has significant assets, these fraud

12  proceeds, with his co-conspirators in Turkey, planning to flee

13  to Turkey if and when it got hot.  And in fact as the Pretrial

14  Services report shows, he was flying to Turkey yesterday, not

15  coincidentally the same time period his codefendant Jacob

16  Kingston was arrested on a flight to Turkey on Thursday last

17  week.  They have comingled their fraud proceeds with a third

18  individual in Turkey who is investing it on their behalf, and

19  one of those investments as is reported in this Pretrial

20  Services report is a private airline called Borajet Airlines

21  that Mr. Termendzhyan has access to and ownership of.  And in

22  fact as is also reported in this Pretrial Services report, he

23  fled to Turkey; although Mr. Termendzhyan says the last time he

24  was in Turkey was approximately six months ago and he stayed

25  six months.  It's actually a year ago, August of 2017, when he

1   departed coincidentally on the same day LAPD was executing

2   search warrants on his home and businesses on a -- the jet --

3   one of the jets that Borajet Airlines owns.  That's what the

4   evidence will show.

5          We also have evidence of in excess of 500 million

6   reportedly being invested by Mr. Termendzhyan and his

7   codefendant Jacob Kingston in this Turkish entity and its

8   investments called SBK Holding AS.  He's got -- he and his

9   codefendant have residences there in Turkey, hundreds of

10  millions of dollars in Turkey; and as he has revealed to this

11  Court, he owns no property here in Los Angeles or the United

12  States.  Although he claims he's been a resident here for 30

13  years, he owns nothing.  It's all in the names of his family.

14  It's all well and good and they're willing to put up those

15  residences and properties as some sort of bond to assure

16  Mr. Termendzhyan's appearance here at this trial.  But there is

17  no amount of money, no amount of property that Mr. Termendzhyan

18  or his family can offer this Court that will assure this Court

19  of his appearance here to face a trial in which, if convicted,

20  he would face the rest of his life in prison.  He has been

21  involved in a long-term scheme, as alleged in the indictment,

22  to steal hundreds of millions of dollars from the United States

23  government, stashing it in Turkey with the plan to flee there,

24  if and when it got hot.  And that's exactly what he intended to

25  do.

1          When he left in August of 2017, when the local police

2    department here executed State search warrants, he did not

3    return as is reported in the Pretrial Services report until

4    Mr. Geragos, who was well aware his client was in Turkey the

5    entire time LAPD was dealing with the assets they seized from

6    Mr. Termendzhyan's home and business, negotiated and got a

7    court to order the release and return of all those seized

8    assets because no prosecutor was involved as my understanding -

9    - I wasn't involved in that search warrant, it wasn't part of

10   our investigation.  Don't know exactly whose investigation that

11   search warrant derived out of.  But it was not something that

12   was going to be pursued by prosecuting offices that were other

13   prosecuting offices like mine who were investigating Mr. Dermen

14   at the time, and so there was a decision to return all that.

15   He did not return to the United States until Mr. Geragos

16   sufficiently acquired that court order.  Then Mr. Termendzhyan

17   returned.  He has traveled to Turkey according to the report at

18   least twice since and, as I said, scheduled to leave the

19   country yesterday.

20          So it is our burden to show merely by a preponderance

21   that he is a flight risk.  And I submit that there is nothing

22   this -- that this Defendant could show to this Court that would

23   convince this Court he would appear for trial in Utah.  The 20

24   or $25 million worth of property that is now listed in the

25   Pretrial Services report as offered by his family, which is a -

1    - I'm sure a genuine offer, could be replaced tomorrow by

2    Mr. Termendzhyan to his family when they lost it when he didn't

3    appear.  He's got hundreds of millions of dollars at his

4    disposal, and a plan to flee.  That has always been the plan.

5             There is also evidence submitted in the Pretrial

6    Services report of Mr. Termendzhyan's danger to the community.

7    As this Court may be aware and this -- the Government is

8    prepared to proffer through special agents, Mr. Termendzhyan

9    has ties to corrupt law enforcement.  There is a recently

10   convicted Federal agent here from California who is a close

11   associate of Mr. Termendzhyan; and, in fact, the Government

12   would proffer an exhibit, photos of Mr. Termendzhyan with this

13   Federal agent the week after he was convicted of committing

14   offenses on behalf of Mr. Termendzhyan for an associate of

15   Mr. Termendzhyan.

16            He has longstanding business ties to law enforcement

17   here, hiring them as moonlighting security guards and other

18   associates.  And the Government would proffer through Special

19   Agent Hatcher that apparently he was tipped off to the search

20   warrant that was executed last August because the Borajet plane

21   from which and on which he fled this country in August of 2017

22   was in the United States two days before the search warrant and

23   left the day the search warrants were executed.

24            So, your Honor, we also have -- I think Special Agent

25   Hatcher would testify if, and I will proffer, that he would

testify no less than four or five witnesses have expressed concern for their safety for reporting facts about their involvement with Mr. Termendzhyan.  I have had no case in my 20-year career in which so many witnesses have expressed a concern about an individual.  There is evidence Special Agent Hatcher would present of threats these witnesses have heard come from the Defendant's mouth.  In fact, there was evidence that around the time of the search warrant, shortly before the search warrant was executed last August, someone took a shot at his cousin who Mr. Termendzhyan, according to the witnesses, believed was providing information to the Government.  The gun jammed and the cousin was not killed.  That's what these witnesses say, as well as you would hear other incidents of threats Mr. Termendzhyan has made about and to other witnesses.

I'll -- what is striking is that Mr. Termendzhyan, you would hear from Special Agent Hatcher, surrounds himself with armed body guards all the time.  It is not just intimidating to those he's in business with, but he is in this case the evidence will show acted has an enforcer and has assumed that role.  So he is surrounding himself with armed body guards, he parades around in multiple vehicles with armed body guards, and displays that sort of power and intimidation to all he deals with.  He is -- has accomplished these crimes with those techniques and I assure this Court as Special Agent Hatcher would proffer, that there is nothing that can be

10

1    offered that would make him appear to face the crimes that he

2    is charged with and will be charged with.  This is a continuing

3    investigation.

4          The last thing I would say is that the charges that

5    were brought are only substantive money laundering counts right

6    now and some tax offenses for the purposes of preserving the

7    statute of limitations during a lengthy investigation in which

8    the Defendants were and have been trying to obstruct the

9    investigation.  The investigation continues, and there is a

10   superseding indictment that is planned to be presented to a

11   Grand Jury.  I know this Court doesn't have the benefit of that

12   but I will submit that the -- as I believe these charges would

13   support, the charges coming are much more severe and detailed

14   in their conspiracy and will lay out how Mr. Termendzhyan is

15   looking at guidelines that will be life in prison.

16         THE COURT:  Thank you very much.  Mr. Geragos, you

17   probably realize you have a bit of an uphill battle here and --

18         MR. GERAGOS:  I really don't think so because --

19         THE COURT:  Well, let me finish because --

20         MR. GERAGOS:  Okay.

21         THE COURT:  -- I'll tell you what I'd like to hear

22   about.

23         MR. GERAGOS:  Sure.

24         THE COURT:  I am pretty certain that you're -- you

25   know, what you should be focusing on is whether or not he's

1   going to show up in court, because I really think that that's a

2   critical issue.  And even before we get to whether we need to

3   have the proffer, I -- you know, from the Pretrial Services

4   report and the indictment, I would be at this point -- and,

5   again, I haven't heard your side yet -- inclined to think he's

6   at least an economic danger.  Again, we haven't had -- that

7   would be without even considering the specific information

8   proffered from the agent that is not contained in the Pretrial

9   Services report.  So let me now let you say your --

10          **MR. GERAGOS:**  Well, as a -- I understand that they

11   don't have a legal basis to ask for detention based on this

12   indictment.  They -- it's not there.  They don't have the

13   ability.  There isn't anything that is mentioned here that

14   under The Bail Reform Act would mandate detention.  In fact,

15   it's quite the opposite.  The -- everything that is mentioned

16   here, he's in four counts for a total of four payments of

17   $210,000 and two others of 70,000.  Unfortunately, and this is

18   part of the problem when government prosecutors are listening

19   to their agents and haven't been involved in the case -- I've

20   been involved in this case since the day the search warrant was

21   executed over a year ago.  I was the one who went down to Long

22   Beach court and appeared in front of Judge Ferrari not once,

23   not twice, but four separate times.  I offered the prosecutors

24   -- and by the way, when they say that there was no

25   prosecutorial agency, it took virtually an act of Congress to

12

1   get a prosecutor down there.  I had to serve the City

2   Attorney's office.  They punted it over to the district

3   attorney --

4          THE COURT:  Regardless, you're not addressing the

5   fact that whether it's the Government or the Court on its own

6   motion when you've got a defendant in a Federal case that is

7   perceived as a flight risk, a motion is appropriate, whether

8   it's ten dollars or a gazillion dollars.  You can argue about

9   whether what he's actually facing and what might be the issue

10  there but, you know, I have an AO-approved checkbox form for

11  detention hearings, and it says, you know, there's the

12  presumption cases and then there's on the motion of the

13  Government or on the Court's own motion when somebody is

14  perceived to be a flight risk.  I perceive him to be a flight

15  risk so address that for me.

16         MR. GERAGOS:  Okay, he's known about this

17  investigation and the search warrant, which was mandated, for

18  well over a year.  It's going on 13 months next month since the

19  search warrant.  At all times -- and the reason I was giving

20  you the litany of prosecutorial agencies, I've talked to the

21  City Attorney, I've talked repeatedly and appeared with the

22  district attorney's office, I've talked with the LAPD person

23  who was tasked on the task force.  We also were told about the

24  U. S. Attorney's involvement here in the Central District.  At

25  all times he was informed and knew what the status was and

13

1    returned here.  Once again, everything that is stated in here

2    as far as the name change and the assets and everything else

3    is, and I would say this respectfully, is nonsense.  They talk

4    about his daughter's wedding in 2016.  It was just months ago

5    this year.  He came back when -- and I can -- if he's going to

6    have this officer get up here and swear under oath as to these

7    proffers, I want to have a hearing and bring the district

8    attorney in who told me they were --

9             THE COURT:  I don't need the proffer.  What I have is

10   a man who was -- he's -- somebody in Utah, a Grand Jury, has

11   found probable cause that he was involved in a very -- in a

12   massive fraud.  So that's probable cause regarding some kind of

13   economic fraud.  I have a man who does a ton of travel, was

14   planning to leave the country, has traveled back and forth.

15   I've got information in the Pretrial Services report that he

16   has, you know, a place to live and he certainly spends a lot of

17   time in Turkey.  And, you know, fortunately or unfortunately,

18   we don't have an extradition treaty with Turkey.  So if he

19   decides to get there, we can't get him back.

20            MR. GERAGOS:  Okay, that's -- I -- that's where I

21   disagree with Pretrial.  We do have an extradition treaty with

22   Turkey.  In fact, that extradition treaty with Turkey has been

23   the subject of much in the news recently.

24            Number two, I have personally tried two jury trials

25   with Mr. Termendzhyan in the last 15 years where he was facing

14

1    substantially more serious charges than this one.  The first

2    one was in Compton.  It ended nine to three for not guilty.

3    The judge dismissed it and commented at the time it was a

4    complete collapse.  He was tried --

5            THE COURT:  I'm interested in the allegations in this

6    case --

7            MR. GERAGOS:  I understand that, but he --

8            THE COURT:  -- and I'm interested in what the

9    Pretrial Services report says here.

10           MR. GERAGOS:  Right.

11           THE COURT:  And, you know, that he was essentially,

12   you know, arrested on his way out of the country, his

13   codefendant was arrested on his way out of the country, --

14           MR. GERAGOS:  He wasn't arrested on his way out of

15   the country.  What they neglected to tell you was he got a call

16   and he went down to meet the agents.  He didn't flee.  He self-

17   surrendered so I don't -- that's what I'm saying, I just

18   listened to this what I -- was a error-filled monologue by the

19   U. S. Attorney which I'm going to try to address and knock down

20   every single one of them.  He wasn't fleeing the country; he

21   self-surrendered.  They didn't go out to get him and arrest

22   him; they called him, he went down.  He knew as recently as 30

23   days ago that the --

24           THE COURT:  Stop screaming.

25           MR. GERAGOS:  He knew that the prosecutors were

1    considering a grand theft by false pretense charges in relation

2    to the bio fuel execution of the search warrant.  That was

3    always on the table.  The only reason that we got the -- or

4    that I made the orders for the return of property -- and by the

5    way, all of the property with the exception -- with some

6    limited exceptions was already ordered returned by a judge in

7    this district, albeit a State Court judge, Judge Ferrari, who

8    gave the prosecutors in court a time limit to either put up or

9    shut up, basically is what the order was.  He did not have a

10   flight to flee.  He got a phone call --

11          **THE COURT:**  Was there an indicted case or even a

12   criminal complaint on him in the State Court case?

13          **MR. GERAGOS:**  There was a search warrant that had

14   been executed --

15          **THE COURT:**  There was a search warrant.  Was --

16          **MR. GERAGOS:**  There was not a criminal complaint --

17          **THE COURT:**  Was there a finding of probable cause by

18   a grand jury somewhere?

19          **MR. GERAGOS:**  No, there was not.

20          **THE COURT:**  All right, I tell you what, let me hear

21   from the Government, and if you want we'll put the agent up.

22   I'm not going to let you, you know, put this over, call

23   witnesses.  You can do that in Utah if you want.  But if you

24   would like to, you know, hear the more serious allegations, I

25   don't think I need them.  I think that I -- purely on flight

1   risk I just don't see that if there's, you know, --

2           **MR. GERAGOS:**  Could I make my record?

3           **THE COURT:**  -- he's got -- you can make your record.

4   He's got the means, clearly has the means to go to Turkey.

5   He's got, you know, could stay there as long as he wants.  And

6   he has the means to get there as well as to stay there.  So --

7           **MR. GERAGOS:**  Let me offer -- well, so the record is

8   clear, --

9           **THE COURT:**  Okay.

10          **MR. GERAGOS:**  -- I'm offering $25 million.  I'm

11  offering GPS.  I spoke to Pretrial yesterday.  I'm offering a

12  third party to monitor where he is and be a liaison with the

13  Court.  And I'm offering or proffering to the Court the

14  statement that, yes, he didn't know about the probable cause

15  finding, as you've mentioned, but he's listed in only four of

16  the 15 counts, for a grand sum of less than a half a million

17  dollars is what the exposure is.  He's not listed, contrary to

18  what was just stated, in any kind of a conspiracy.  And under

19  The Bail Reform Act, the duty is to find if there is a less

20  restrictive ability to -- that can be fashioned, which I'm not

21  -- I -- apparently I'm not getting the opportunity to fully

22  argue this as to why I think this Court has a duty under The

23  Bail Reform Act to allow him to proffer all of those conditions

24  which are less restrictive than detention.  There is no -- they

25  have the burden.  This is not a rebuttable presumption case.

```
1    They have only indicted him -- and it's great if they want to
2    make this detention argument, we could have them save it for
3    the time when they do their superseding indictment.  But the
4    fact is right now, he was not fleeing anywhere.  He's been --
5    and the reason I cited the prior cases, your Honor, is
6    precisely to try to convey to you that he has faced much more
7    serious charges, that he has never run, he's made all court
8    appearances at all time, and he's been acquitted not once but
9    twice before.  The -- invoking the law enforcement or the
10   corrupt Federal agent, they've gotten the facts wrong.  I
11   understand you don't want to hear about that so I won't belabor
12   that but the fact remains that the witnesses that the
13   Government is citing are witnesses that are -- that have
14   embezzled money from him and are involved in civil litigation.
15   I understand that the Government can throw around 500 million,
16   400 million, there's no evidence of any of that.  They've got
17   somebody, and I suppose it's the case agent, who's listening to
18   the guy who stole $25 million from who, by the way, is a lawyer
19   who's now got the State Bar taking action with him.  So I
20   understand you want me to calm down, but I don't know why I
21   have to listen to the U. S. Attorney cite this parade of
22   nonsense, which I know to be not true because I've been
23   involved with this gentleman and with his family for over a
24   decade, and I know what the facts are.  And every single thing
25   virtually that he said is belied by what the real facts are.
```

18

1        If you're an Armenian and you're in Turkey, having a

2   Y-A-N or an I-A-N use -- will subject you to all kinds of

3   trouble.  It's one of the reasons why Geragos is Geragos and

4   not Geragosian.  When my grandfather came to this country, he

5   dropped the I-A-N.  So there is almost an inherent cultural

6   insensitivity when they make the argument that the reason he

7   converted to Lev Dermen is because he wanted to be Turkish.

8   That isn't it.  That's a common trick that what Armenians do,

9   my grandfather included, when they go to another country and

10  don't want to be discriminated against as an Armenian.  He is

11  not fleeing.

12        He -- there is no economic threat here.  The idea

13  that this case is at any point economically or more frightening

14  than two of the other trials I've gone through with him is

15  frankly almost a joke because the other cases were double

16  digit, if not life, tops.  And he stood trial, he had jurors

17  that were out for days, he never fled.  And in both cases, one

18  was a hung they dismissed, the other was a not guilty in this

19  Central District here.  He appeared at every time early for

20  every appearance.  He's not going anywhere.  In fact, the Court

21  order on the return of property specifically ordered that the -

22  - on this very search warrant that they're talking about, that

23  the money be held in trust pending further order of the Court.

24  He's not going to flee and leave that money.  He's not going to

25  flee and leave his brother, his son, his nephew, his family.

```
 1   He's got all of this -- he's built quite a oil and gas empire
 2   here in southern California that is run by the rest of his
 3   family.  He's -- the reason that he has been in Turkey and
 4   going back and forth is not the parade of horribles argument
 5   that the Government made here but a highly personal reason on
 6   his behalf since the suicide several years ago of his wife.  He
 7   came back smack dab in the middle of this investigation and he
 8   did not -- by the way, the facts as just represented, I want to
 9   hold the Government to those too in terms of the execution of
10   the search warrant and when he left the country and when he
11   came back because they don't comport with the reality on the
12   ground.  He came back and --
13           THE COURT:  All right, let me -- then let me hear
14   from the Government and then I want to put the -- go ahead and
15   put the agent on because I am -- you know, if we're going to go
16   down this road, I want him to be able to ask his questions.  I
17   want to hear about this alleged witness intimidation.  And I
18   want you to address his points about the indictment which I
19   read but I did not re-read.  I will do that while I'm sitting
20   here but I read that at his initial appearance.  So I'll hear
21   from the Government again and then we'll get the agent sworn.
22           MR. ROLWING:  Thank you, your Honor.  All the talk
23   Mr. Geragos makes of this so-called search warrant, the search
24   warrant I mentioned is not the search warrant that relates to
25   this investigation at all.  It has nothing to do with this
```

20

1    case.  There's no allegation of this fraud in that search

2    warrant affidavit, and yet he fled the day it was executed.

3           This -- let me just correct what Mr. Geragos said.

4    This was not a self-surrender by Mr. Dermen.  Instead,

5    Mr. Dermen was trying to -- he called the IRS office this week,

6    the evidence will show, to invite himself down to offer

7    evidence on someone else.  He happens to be in a lawsuit with

8    one witness who has been providing information, according to

9    Mr. Dermen, to the Government.  And he found this out and he's

10   tried to flip the tables and wants to provide information on

11   that individual.  The IRS, knowing we wanted him arrested this

12   week or this past week, invited him down under a ruse to show

13   up so that we could arrest him without his armed body guards

14   coming through security and in his presence.  So there was no

15   self-surrender.  He was not aware of this indictment.  It was

16   under seal.  He didn't surrender to anything except comply with

17   his own invitation to come down and provide information on

18   another.

19           And, finally, I think the Court can take judicial

20   notice, this is in the public realm, that President Erdogan has

21   announced there will be no extraditions from Turkey to the

22   United States until the United States extradites the cleric,

23   Gulen, in Pennsylvania, who Erdogan is so hot to trot to have

24   extradited and the United States will not extradite.  That is

25   in the public record.  You can do a Google search on it.  Even

1    if there is a treaty, that treaty is not being applied with per

2    the President of Turkey, President Erdogan.

3            **THE COURT:**  That's actually my recollection.  Whether

4    or not I take judicial notice of it is a whole nother issue.

5    But that was my recollection as well.  Okay, though, but let's

6    -- you know, Mr. Geragos wants to be able to make his record,

7    and perhaps he's quite eloquent and convince me.  I'm still

8    skeptical.  But I do think that we should -- I was hoping to

9    avoid this so that we weren't here forever but let's go ahead

10   and put the agent on and make your proffer on the danger

11   issues.

12           **MR. ROLWING:**  Government calls Special Agent Hatcher.

13           **THE CLERK:**  Please raise your right hand.

14            **TYLER HATCHER, GOVERNMENT'S WITNESS, SWORN**

15           **THE CLERK:**  Please be seated and state your full name

16   and spell your last name for the record.

17           **THE WITNESS:**  My name's Special Agent Tyler Hatcher.

18   It's T-Y-L-E-R H-A-T-C-H-E-R.

19           **MR. ROLWING:**  Your Honor, if I might, I just heard

20   the Court say put on the witness regarding --

21           **THE COURT:**  You can address whatever you want to

22   address.  I just at this point I'm -- you should put on the

23   evidence of flight as well.  I'm just -- because I'm still

24   leaning that direction even on the flight issue.  But I wanted

25   -- because there were a lot of allegations made about danger,

1   about potential witness threats or witness tampering, issues

2   like that and, you know, I normally would not consider them at

3   all.  But if they're -- you know, they're being challenged, so

4   I would like the -- you to, you know, get the proffer from the

5   agent and then Mr. Geragos can question if he would like.

6         **MR. SPEAKER:**  I was just going to say, if you're

7   normally not going to consider them at all, then I don't need

8   to hear them.  That's -- I mean, if that's not going to be part

9   of your ruling and your ruling is purely on the economic, I'm

10  willing to submit on that.

11        **THE COURT:**  Well, now that we've gotten this far, you

12  know, I've had really good argument as I had really good

13  argument when Mr. Geragos was my opposing counsel 20 years ago.

14  And so now I guess I want to make sure that I've got the full

15  picture before I make a decision.  So why don't you go ahead

16  and make your proffer through the agent or put on the evidence

17  through the agent.

18        **MR. ROLWING:**  I -- and if I might, your Honor, just

19  remind the Court that the Government's motion for detention is

20  primarily based on the risk of flight of Mr. Dermen, which we

21  need only prove by a preponderance of the evidence under the

22  standards.

23        **THE COURT:**  Yeah, I have my AO form memorized so I

24  think we're good on that, but --

25        **MR. ROLWING:**  Okay.

1    **THE COURT:** -- on what the standards are.  So let's

2    just get to the facts.

3                      **DIRECT EXAMINATION**

4    **BY MR. ROLWING:**

5    Q    Special Agent Hatcher, would you just introduce yourself

6    to the Court, who you are, what you do, where you're from?

7    A    Yeah.  I'm a special agent with IRS.  I've been a special

8    agent since 2002, and I'm one of the case agents on this

9    investigation.

10   Q    How long have you been assigned to this investigation?

11   A    Almost two years.

12   Q    During the course of that investigation, did you at any

13   time meet Defendant Dermen?

14   A    I did.

15   Q    When?

16   A    It was probably I think in June of this year.

17   Q    And did you show up at his place of business with a

18   subpoena?

19   A    I did.

20   Q    And was it a subpoena for him?

21   A    No, it was not.

22   Q    Who was it for?

23   A    It was for NOIL, his company, but more specifically Dan

24   McDyre, who's listed as the president of NOIL.

25   Q    And did you deal with Dan McDyre?

1   A    Sort of.

2   Q    Explain.

3   A    I went there, I was looking for the president of NOIL, and

4   Mr. Termendzhyan introduced himself as Levon, and answered most

5   of my questions directed at Mr. McDyre.

6   Q    You both -- they both were in your presence, --

7   A    Correct.

8   Q    -- Mr. McDyre.

9   A    That's correct.

10  Q    But your questions to Mr. McDyre were answered by

11  Mr. Dermen?

12  A    Correct.

13  Q    Did you get the sense of who was in charge?

14  A    Mr. Termendzhyan was definitely in charge.

15  Q    And did you reveal to him that he was under Federal

16  investigation by you and your --

17  A    I did not.

18  Q    Did you suspect that he knew this at that time?

19  A    I did not.

20  Q    In fact, what did you say after this meeting?

21          **MR. GERAGOS:**  Objection, to who?

22  Q    What did you say to your team, your other agents, about

23  whether Mr. Termendzhyan believed he was a target of the

24  investigation at that time?

25          **MR. GERAGOS:**  Objection, hearsay.

Hatcher - Direct / By Mr. Rolwing                    25

1          **THE COURT:**  Yeah, sustained as to what he said.  What

2   -- he can tell me what he thought or what he believed but I

3   don't think the hearsay itself is necessary.

4          **MR. ROLWING:**  Your Honor, all right, I'll rephrase.

5   **BY MR. ROLWING:**

6   Q    After that interaction with Mr. Termendzhyan, did you have

7   any sense that he believed he was a target of your

8   investigation?

9          **MR. GERAGOS:**  Objection, calls for speculation.

10          **THE COURT:**  I'll allow it.

11  **BY MR. ROLWING:**

12  A    No, he did not.

13  Q    So when he called the -- did you learn that he called the

14  IRS office this past week?

15  A    I did.  I spoke to the special agent that took the calls.

16  Q    And what was the reason Mr. Termendzhyan called the IRS

17  office; was he aware of the indictment, did he say?

18          **MR. GERAGOS:**  Objection, hearsay, compound, --

19          **THE COURT:**  That's --

20          **MR. GERAGOS:**  -- speculation.

21          **THE COURT:**  Well, it's not hearsay if it's an

22  admission of a party opponent here.  He's saying what -- you

23  know, what the reason -- it's not even for the truth of the

24  matter, what the reason is that he had at least allegedly

25  expressed to the IRS.

 1   **BY MR. ROLWING:**

 2   A    I spoke to the agent that took the phone call and he said

 3   that Mr. Termendzhyan reached out and had some information he

 4   wanted to share with the IRS.

 5   Q    Did he indicate that he wanted to self-surrender to an

 6   indictment?

 7   A    No.

 8   Q    And in fact did -- what instructions did you give that

 9   agent?

10   A    I asked the agent to make the appointment for Friday, so

11   this last Friday, sometime in the afternoon so that we could

12   arrest him.

13   Q    And then why did the arrest happen on Thursday?

14   A    Our agents in Los Angeles were busy that day with another

15   operation in the morning and I reached out I think sometime

16   around noon or 1:00 and asked them to put surveillance on

17   Mr. Termendzhyan until we could effect the arrest on Friday.

18   And they at that point decided to contact Mr. Termendzhyan to

19   see if he could come in and make his statement Thursday

20   afternoon.  That's when he was arrested.

21   Q    Have you interviewed witnesses surrounding

22   Mr. Termendzhyan's access to private planes?

23   A    I have.

24   Q    Have you -- has anyone revealed to you that he does travel

25   by private plane out of the country?

1   A    Yes.

2   Q    Were you informed of his travel last August?

3   A    I was.

4   Q    Explain to the Court how you learned about it.

5   A    I spoke to another special agent associated with

6   investigations in California who relayed to me that he received

7   a phone call from Customs and Border Patrol saying that he was

8   on his way out.

9          **MR. GERAGOS:**  Objection, multiple levels of hearsay.

10         **THE COURT:**  It's also a -- happens to be a detention

11  hearing so it's -- I'll allow it.

12  **BY MR. ROLWING:**

13  Q    He said to you what?  I'm sorry.

14  A    That agent let me know that CBP, Customs and Border

15  Protection, notified him that Mr. Termendzhyan was on his way

16  on a flight out of the country.

17  Q    And did you investigate what -- and what was happening

18  that day did you learn?

19  A    That was the day of the State search warrants in August of

20  last year.

21  Q    And were those State search warrants related to your

22  investigation?

23  A    They were not.

24  Q    Were they authorized by you?

25  A    No.

1   Q    Your team?

2   A    No.

3   Q    Were they known that -- before the execution by your team?

4   A    No.

5   Q    Were you a part of or was the prosecution team you're

6   associated with in your investigation a part of any of those

7   litigation hearings Mr. Geragos spoke to this Court about?

8   A    No.

9   Q    And did you later investigate and uncover what plane

10  Mr. Termendzhyan left the country on that day in August of

11  2017?

12  A    I did.

13  Q    What was that plane?

14  A    It was a plane that we later found out was a Borajet with

15  "SBK" on the tail.  And I don't remember the ail numbers.  It's

16  T-C I believe "Y" something.

17  Q    I'm going to hand you --

18            MR. ROLWING:  If I may, your Honor, approach the

19  witness with an exhibit?

20            THE COURT:  You have copies for counsel as well?

21            MR. ROLWING:  Handed one to Mr. Geragos.

22            THE COURT:  Okay.

23            MR. ROLWING:  I have one for the witness and for the

24  Court.

25            THE COURT:  Thank you.

1    **BY MR. ROLWING:**

2    Q    Do you recognize that plane, Mr. Hatcher?

3    A    I do.

4    Q    What -- how do you recognize it?

5    A    This is the plane we can see the tail number on that

6    engine, T-C-Y-Y-A.  I recognize this as the plane that

7    Mr. Termendzhyan left the day of the warrants in August of last

8    year.

9    Q    And what is the symbol on the tail?

10   A    That's "SBK Holding," which is the "SBK" -- as we know it

11   "SBK Holding AS" in Turkey.  The "TC" indicates it's a Turkish-

12   based registration.

13   Q    And what is SBK Holding AS, as you know it in Turkey?

14   A    It's a joint holding company as we understand it, jointly

15   owned or controlled by a Turkish individual whose initials are

16   "SBK," Sezgin Baran Korkmaz, Mr. Termendzhyan, and

17   Mr. Kingston, who's the main target in our investigation in

18   Utah.

19   Q    And have you uncovered in your investigation that

20   Mr. Kingston -- can you explain who Mr. Kingston is to the

21   Court, please?

22   A    Yeah, Mr. Kingston's the CEO or owner of Washakie

23   Renewable Energies, who was the main target of our

24   investigation and responsible of the 500 million payouts that

25   you mentioned before, and is also a business partner of

 1   Mr. Termendzhyan.

 2   Q    And does Mr. Kingston also share some partnership in SBK

 3   Holding AS in Turkey?

 4   A    My understanding, yes.

 5   Q    According to witnesses.

 6   A    According to witnesses and a press release in Turkey and

 7   other documents we've uncovered.

 8   Q    I'm going to hand you what's been marked as Government

 9   Exhibit 5.  The airplane was Government Exhibit 1.  I've handed

10   one to Mr. Geragos.  Do you recognize Government Exhibit 5?

11   A    I do.

12   Q    What is it?

13   A    This is an English translation of a Turkish press release

14   that we uncovered through the course of our investigation.

15   Q    And it says: "The Republic of Turkey Prime Ministry

16   Investment Support and Promotion Agency."

17   A    It does.

18   Q    Is that a government agency as far as you know?

19   A    My understanding is yes.

20   Q    And what is being announced here in September of 2016?

21   A    Just speaking in terms of how I interpreted it, it's an

22   announcement of a joint venture, if you will, for $950 million

23   cash flow.  And it was broken down between 450 million that was

24   already invested in Turkey by as it says at the top here, NOIL

25   Energy Group, U. S.-based Washakie Renewable Energy, and SBK

Hatcher - Direct / By Mr. Rolwing                    31

1   Holding, LLC, which is a U. S.-based joint venture, if you

2   will, between Mr. Termendzhyan and initially Mr. Kingston.

3   Q    SBK Holding, LLC is different than SBK Holding AS.

4   A    Correct.

5   Q    Would you explain that to the Court?

6   A    SBK Holding, LLC later changed to SBK Holding USA, is a

7   USA sister company, if you will, of SBK Holdings AS.

8   Q    And who controlled SBK Holding, LLC here in the United

9   States?

10  A    Initially it was Mr. Kingston and Mr. Termendzhyan, but

11  Mr. Kingston was later pushed out.

12  Q    And who was on the bank account for SBK Holding, LLC?

13  A    On that one was Mr. Termendzhyan and his son George.

14  Q    Was Jacob Kingston ever on the bank account?

15  A    Not to my knowledge.

16  Q    And this -- if you move down to paragraph one, two, three,

17  four, five, the last sentence of paragraph five on page one.

18  A    Are you referring to "NEG has established a $500 million

19  recovery fund?"

20       **THE COURT:**  He's looking at the --

21  Q    No.

22       **THE COURT:**  -- total investments made since 2015.

23  A    Oh, I'm sorry, yeah, total investment to hit the 950

24  million mark.

25  Q    No, the total -- read -- the sentence on the last

1  paragraph of paragraph five, the one above the one you read.

2  "Total investments made since 2013 in collaboration with and

3  under the management of SBK Holding have reached 500 million."

4  A    Yes, I see that.  I apologize.

5  Q    Since 2013.

6  A    Correct.

7  Q    How much did your investigation reveal Washakie Renewable

8  Energy applied for and received from the United States in 2013

9  in refundable, renewable fuel tax credits?

10 A    They applied for over a billion and received a little over

11 500 million.

12 Q    From 2013 forward.

13 A    From 2010 forward, correct.

14 Q    And in 2013, it was approximately 286 million.

15 A    That's correct.

16 Q    And 170 million in 2014.

17 A    Correct.

18 Q    Another 600 million applied for in 2015.

19 A    That's correct.

20 Q    And this in -- actually applied for in 2016 for the 2015

21 year.

22 A    Correct.

23 Q    And this press release suggests that in addition to the

24 500 million that has been invested since 2013, another 450

25 million is poised to flow into Turkey.

1   A    Correct.

2   Q    Did you trace any of the refunds that the Department of

3   Treasury paid Washakie to Mr. Termendzhyan and Mr. Kingston and

4   Mr. Korkmaz's SBK entity or investments in Turkey?

5   A    I have.

6   Q    How much?

7   A    It's a little over 130 million.

8   Q    Directly from the Department of Treasure, U. S. Department

9   of Treasury.

10  A    From Treasury through Mr. Kingston controlled accounts to

11  either SBK USA or SBK Turkey or other Turkish investments that

12  we've uncovered.

13  Q    And did those start in 2013, much like this press release

14  --

15  A    They did.

16  Q    -- says?  Did you -- have you also seen Mr. Termendzhyan

17  sending money to Turkey?

18  A    I have.

19  Q    Bank records show.  How about SBK Holding, LLC in the US,

20  SBK Holding USA, did they send money to Turkey?

21  A    Yes, they did.

22       **(Pause)**

23  Q    I'm going to hand you what's marked Government Exhibit

24  Number 7.  You recognize this photo, Special Agent Hatcher?

25  A    I do.

1   Q    Can you tell the Court who's in it?

2   A    If we look from my left, on the far left, that's Mr. Jacob

3   Kingston.  Standing next to him is we know SBK, or Sezgin

4   Baran Korkmaz, as Baran.  And I believe the middle

5   person with his hands on the chair is the president of

6   Turkey.  And I'm not sure who the person standing next

7   to him is.  I've never seen him.

8   Q    Has your investigation revealed that Mr. Dermen and

9   Mr. Kingston have, through Mr. Korkmaz, some sort of

10  relationship with the President of Turkey, Erdogan?

11  A    Yes.

12  Q    Have witnesses -- have any witnesses mentioned to you and

13  your team of investigators whether Mr. Erdogan is willing to

14  extradite -- agree to some extradition request for these two if

15  they are -- if it's requested by the U. S.?

16  A    Witnesses have told us that Mr. Baran and Mr. Termendzhyan

17  have used their wealth to ensure that their money would be a

18  safe haven in Turkey as well as protect them against

19  extradition.

20  Q    Government Exhibit 6, is Government 6 a declaration of one

21  Levon Termendzhyan in a civil suit here in Los Angeles between

22  SBK Holding USA, Inc., that entity you just testified about,

23  and an individual known as Edgar Sargsyan and some other

24  entities?

1   A    It is.

2   Q    In this declaration, if you turn to paragraph six --

3   first, let's tell the Court when it's dated on page two of the

4   declaration.

5   A    It's dated October 17th of 2017.

6   Q    Is that just a few months after he fled on that plane

7   exhibited in Government Exhibit 1?

8   A    Yeah, he fled in August.

9   Q    And what does he say in paragraph six?

10  A    Would you like me to read it verbatim?

11  Q    Yes.

12  A    It says:

13          "Although I am residing in Turkey, I'm available and

14          willing to be deposed in Istanbul, though I

15          understand Defendant's counsel is not willing to

16          travel to Istanbul.  Because I am not avoiding a

17          deposition, I have no objection to having my

18          deposition taken by video conference or something

19          similar if the attorneys all agree where I can remain

20          in Istanbul and Defendant's counsel can remain in Los

21          Angeles.  It is incredibly difficult and cost

22          prohibitive for me to travel from Istanbul to Los

23          Angeles now to have my deposition taken in Los

24          Angeles, only to then have to fly back to Istanbul

25          thereafter to resume my business operations."

1   Q    Have you spoken to the attorney representing Edgar

2   Sargsyan in this lawsuit?

3   A    I have.

4   Q    And has he complained that Mr. Dermen has ignored court

5   orders to appear for depositions?

6   A    My understanding is at least once.

7   Q    And was he not ordered to appear by August 20th of this

8   month to appear for a deposition in a civil case, which he did

9   not appear?

10  A    Correct.

11  Q    And this declaration relates to a deposition that they

12  were trying to schedule last -- 2017.

13  A    In October.

14       **(Pause)**

15  Q    Please tell the Court do you know where Defendant Dermen

16  lives?

17  A    I thought that I had an address for him which was on

18  Sheringham.  But when he was booked, he listed another couple

19  addresses that I have -- was not aware of.

20  Q    Are there numerous residences here in Los Angeles that

21  Mr. Termendzhyan has associated himself with now?

22  A    Yes.

23  Q    And are -- do you know whether any of the companies other

24  than SBK Holding USA, Inc. or LLC are owned by -- listed as

25  owned by Levon Termendzhyan?

1    A    No.  They're usually held by nominees.

2    Q    Yet when you went to subpoena Dan McDyre as the president

3    of NOIL Energy, it was Mr. Dermen who said what when you asked

4    Mr. McDyre to possibly appear and be interviewed by you or

5    testify in a Grand Jury?

6    A    Yeah, when I served the subpoena, it was a subpoena for

7    records.  And I advised Mr. McDyre at that time that it may be

8    necessary to subpoena him to Utah for a personal appearance.

9    And Mr. Termendzhyan answered for him and said he would not let

10   him come.

11        **(Pause)**

12   Q    Does the IRS or the Federal government have some other

13   means you're aware of to bring Mr. Dermen back from Turkey once

14   he flees there?

15   A    No, I'm unaware.

16   Q    Is -- based upon your investigation, Special Agent

17   Hatcher, and this press release announcing some four or 500

18   million invested in Turkey, do you believe Mr. Termendzhyan has

19   sufficient assets in Turkey to remain there the rest of his

20   life?

21   A    I do.

22   Q    Have witnesses told you he has a house there?

23   A    Yes.

24   Q    More than one.

25   A    Possibly.

1       **(Pause)**

2    Q    How many witnesses have indicated to you approximately

3    that they are afraid to provide evidence surrounding

4    Mr. Termendzhyan?

5    A    I've interviewed dozens of witnesses in this case and many

6    of them indicate fear for -- you know, of Mr. Termendzhyan.

7    But I can think of three or four with specific instances of

8    seeing him or hearing of him doing harm to other witnesses in

9    related cases or, you know, employees or people surrounding

10   him.

11   Q    Are you inclined to reveal the witnesses here today?

12   A    I would rather not.

13   Q    Have they asked --

14          **MR. GERAGOS:**  Then there's a motion to strike, it's

15   not admissible evidence.

16          **MR. ROLWING:**  No.

17          **THE COURT:**  It's denied because we're also not

18   talking about -- we're not in a trial now where everything has

19   to be admissible under the Federal rules.  I need to be

20   considering -- you know, you're going to get an opportunity to

21   cross examine.  I realize you won't have the names but -- and I

22   will, you know, tell you what I need to consider or not

23   consider at the end of these proceedings.  But we don't have to

24   play strictly by the rules of evidence in this case.

25          **MR. ROLWING:**  And along those lines, your Honor, I

Hatcher - Direct / By Mr. Rolwing                    39

1    want to note that the Ninth Circuit's pretty clear that

2    hearings of this nature are not discovery devices for

3    Defendant.

4            **THE COURT:**  And I'm fully aware of that as well.

5    It's -- that's part of my job, too.

6            **(Pause)**

7    **BY MR. ROLWING:**

8    Q    In -- have Mr. Termendzhyan and Mr. Kingston comingled

9    their money based upon your investigation?

10   A    Yes.

11   Q    In fact, who paid the VAT tax on the purchase of a mansion

12   in Turkey in March of 2014 for the waterside house?

13   A    It came out of Washakie funds.

14   Q    Washakie paid how much to -- for a VAT tax related to a

15   waterside mansion in Turkey?

16   A    I want to say it was 483,000, but I don't have the wire

17   right in front of me.

18   Q    And they paid it to a bank account in the name of Levon

19   Termendzhyan in Turkey at Guaranty Bank, right?

20   A    Correct.

21   Q    And was that 483,000 paid by Jacob Kingston and Isaiah

22   Kingston, his two codefendants, their company, Washakie

23   Renewable Energy, was that proceeds of their fraud in 2014?

24   A    It was.

25           **(Pause)**

Hatcher - Direct / By Mr. Rolwing                40

1    Q    Have any witnesses revealed to you that Mr. Termendzhyan

2    has law enforcement contacts and tries to keep tabs on

3    investigations?

4    A    Many times.

5    Q    And have you taken efforts during the course of this

6    investigation to keep the circle close so that the indictment

7    that was returned would not be leaked?

8    A    Yes.  That's why we kept it mostly in Utah.

9    Q    Do you have any evidence that Mr. Termendzhyan was aware

10   of this indictment that he was arrested on last week?

11   A    None whatsoever.

12   Q    So was there any sense that he was self-surrendering in

13   your eyes?

14   A    He was not self-surrendering.  We rused him to come into

15   our office.

16        **(Pause)**

17   Q    If the -- the search warrants executed by the State agent

18   and signed by a State judge in that State investigation in

19   August of 2017 were preceded by interviews by that LAPD

20   officer, right?

21   A    It's my understanding, yes.

22   Q    And did you learn that he interviewed -- did you read his

23   search warrant affidavit?

24   A    I don't think I read that one, no.

25   Q    Okay.  Are you aware of who or whether he claimed he had

Hatcher - Cross / By Mr. Geragos                    41

1   confidential informants informing him of certain conduct they

2   were investigating of Mr. Dermen?

3   A    I believe that he had CIs, or confidential informants,

4   yes.

5   Q    And did witnesses you interviewed at or around that time

6   reveal that they thought Mr. Termendzhyan was trying to have

7   one of those witnesses killed?

8   A    Yes.

9   Q    And were there shots fired at a witness?

10  A    My understanding is yes.

11  Q    Or did the gun -- or shots attempted to be fired?

12  A    Yes.

13          **MR. ROLWING:**  Nothing further, your Honor.

14          **THE COURT:**  Okay.  Mr. Geragos?

15                    **CROSS EXAMINATION**

16  BY MR. GERAGOS:

17  Q    Are you aware that the shots that were fired were at his

18  son?

19  A    I am not aware with the -- of the circumstances.  Just --

20  Q    Well, have you looked at the indictment in this district

21  of the -- and the plea agreement for the officer, you know,

22  John Balunis (phonetic)?

23  A    I have not looked at that.

24  Q    You haven't looked at that?  Do you know that the

25  allegation is the only shots fired were at Mr. Termendzhyan's

1    son?

2    A    I'm not familiar with that.

3    Q    Have you seen published reports that Gevork Termendzhyan

4    was the -- the victim, who's sitting in court here, that it

5    wasn't shots fired by Mr. Termendzhyan, it was shots fired at

6    his son?

7    A    I am unaware of that.

8    Q    Well, who was it that the shots were fired at?

9    A    My understanding, it was a witness.

10   Q    Well, is -- where did you get that understanding?

11   A    From a witness.

12   Q    From what witness?

13   A    I'm not going to divulge that.

14   Q    You're not at liberty to say?

15   A    Nope.

16   Q    Are you at liberty to review any of the federal matters or

17   information surrounding the shots fired?

18   A    It's not a part of my case, so I don't know anything about

19   it.

20   Q    You've never talked to John Ballion (phonetic) or any of

21   the agents who prosecuted or investigated John Ballion?

22   A    I have not talked --

23   Q    Is that your testimony?

24   A    I have not talked to him, no.

25   Q    You what?

Hatcher - Cross / By Mr. Geragos                    43

1          **THE COURT:**  Let me assure you, Mr. Geragos, I'm

2   not -- I am not going to consider, because I just don't think I

3   need to consider, the -- any of the state court proceedings.

4          **MR. GERAGOS:**  It isn't state court. I'll get to that

5   in a second.

6          **THE COURT:**  All right.

7   **BY MR. GERAGOS:**

8   Q    You just testified this was a state court warrant,

9   correct?

10  A    Which warrant are you referring to?  I'm sorry.

11  Q    The one that the -- we talked about or that your -- your

12  U.S. Attorney has been talking about; August, last year.

13  A    The one last August was a state --

14  Q    Yeah.

15  A    -- search warrant.

16  Q    Do you know where all the property was turned over to?

17  A    I don't know.

18  Q    Homeland Security?  Do you know who Matthew Denham

19  (phonetic) is?

20  A    I don't know who that is.

21  Q    General Counsel for ICE, who supervised all of the

22  property, everything that was -- that was seized by LAPD?  Are

23  you aware of that?

24  A    I'm not.

25  Q    You said you talked to Edgar Sargsyan's lawyer.  Is that

1   right?

2   A    Correct.

3   Q    Do you know that Edgar Sargsyan is under investigation for

4   embezzling over $10 million from Mr. Termendzhyan?

5   A    I'm not aware of an investigation.  I'm aware of the civil

6   litigation, but that's all I'm aware of.

7   Q    What is the -- what's the allegation in the civil

8   litigation as to Edgar Sargsyan?

9   A    I don't know the particulars.  I just know there's

10  something going on.

11  Q    Did you know -- well, you don't know the particulars.

12  When you interview somebody who is a lawyer for somebody making

13  accusations, don't you want to know if they have an ax to

14  grind?

15  A    I look for the facts relevant to my case.

16  Q    Okay.  What was the facts relevant to the case as to the

17  dispute between Edgar Sargsyan or Mr. Termendzhyan?

18  A    I'm not sure I understand your question.

19  Q    Did you know that Edgar Sargsyan was Mr. Termendzhyan's

20  lawyer and stole over $10 million from him?

21  A    I'm not aware that he acted as legal counsel, no.

22  Q    Did you know that Mr. Sargsyan is a lawyer?

23  A    I did.

24  Q    Did you know that Mr. Sargsyan was representing

25  Mr. Termendzhyan?

Hatcher - Cross / By Mr. Geragos                    45

1   A    I did not.

2   Q    Did you ask the lawyer, by the way, what was the

3   relationship between Edgar Sargsyan and Mr. Termendzhyan?

4   A    I did ask him.

5   Q    And what did he tell you?

6   A    He said he was the president or he ran SBK Holdings, USA;

7   he did not act as legal counsel.

8   Q    Oh.  And, so, you accepted that at face value, didn't

9   review any documents in connection with that; is that right?

10  A    I did.

11  Q    Did you -- by the way, you said you did the tracing of the

12  funds?

13  A    I did.

14  Q    And where did you see the funds going from Levon

15  Termendzhyan to the Turkish entity?  Where did -- was that wire

16  transfers that you have in your possession?

17  A    Wire transfers from SBK USA, of which Levon is the

18  signatory on the bank account.

19  Q    And this press release.  This press release, did you --

20  what did you do to substantiate the monies that are mentioned

21  in this press release?

22  A    Well, we tried to reach out to Turkey to get a request for

23  records, but as it's been discussed, they are not cooperative

24  right now.

25  Q    Well, when you say "discuss," did you translate this?

1  A    I did not.  I don't speak Turkish.

2  Q    Okay.  Do you know who did translate this?

3  A    I don't.

4  Q    Did you -- where did you get this from?

5  A    It came from -- on line.

6  Q    On line.  And, so, you had an online document which you

7  had somebody else translate; you have no records whatsoever

8  that support it, correct?

9  A    I have bank records that show money went to Turkey.

10  Q    Nine hundred million dollars?

11  A    Not that much.

12  Q    Five hundred million dollars?

13  A    No.

14  Q    Three hundred million dollars?

15  A    A hundred and thirty.  It's been stated.

16  Q    A hundred and thirty is what you have.  You've got a press

17  release that you don't know who translated it, of unknown

18  origin; it was on the internet.  Correct?

19  A    Correct.

20  Q    You have Edgar Sargsyan's lawyer telling you stuff,

21  correct?

22  A    Correct.

23  Q    You went on your own to Mr. Termendzhyan's office; is that

24  right?

25  A    I did.

Hatcher - Cross / By Mr. Geragos                    47

1    Q    A month ago or June?

2    A    In June.  Uh-huh.

3    Q    Is that yes?

4    A    Yes.  In June.

5    Q    When you went there, did he tell you, "Uh-oh, I've got to

6    get out of here; the IRS CID is here"?

7    A    No.

8    Q    Did you identify yourself as the Criminal Investigation

9    Division?

10   A    I did.

11   Q    Did you say that you're -- what did you tell him you were

12   investigating?

13   A    I didn't tell him what I was investigating.  I said I was

14   dropping off a subpoena for records, for the business records

15   of NOIL.

16   Q    Okay.  Does it say on the subpoena "Criminal Investigation

17   Division"?

18   A    I don't believe so.

19   Q    You don't think that your name has that CID next to it?

20   A    My name's not on the subpoena.

21   Q    Whose name was?

22   A    It's the U.S. Attorney's office.

23   Q    And does the U.S. Attorney's office say Criminal

24   Investigation Division?

25   A    I don't think there is a criminal investigation division

Hatcher - Cross / By Mr. Geragos                48

1   of the U.S. Attorney's office.

2   Q    No.  How about the -- how about from Washington, DC?  Is

3   there a criminal investigation division of the IRS?

4   A    Not to my knowledge.  Not -- not from prosecutors.

5   Q    Not from prosecutors.

6   A    Correct.

7   Q    How about from the agency?

8   A    Sure.  Absolutely.

9   Q    And did you -- and did he flee after that?

10  A    He was unaware that we -- we were looking for him.

11  Q    Well, was it a grand jury subpoena?

12  A    It was.

13  Q    Okay.  So, you've got a -- and did it say civil on it or

14  did it say criminal?

15  A    I am not that familiar with the subpoena.

16  Q    Well, the subpoena says criminal on it, doesn't it?

17  A    I don't know.

18  Q    It says grand jury on it, doesn't it?

19  A    It says grand jury subpoena, correct.

20  Q    Right.  So, you've got a grand jury subpoena; you go to

21  his office; he's the one who -- he was cooperative, correct?

22  A    Correct.

23  Q    He answered all of your questions, correct?

24  A    I wasn't questioning -- questioning him.  I was trying to

25  question Mr. McDyre.

Hatcher - Cross / By Mr. Geragos                    49

1   Q    Okay.  But he was volunteering the information.

2   A    Correct.

3   Q    He wanted to tell you whatever it was you wanted to know,

4   correct?

5   A    I was trying to clarify for him which records I was

6   looking for, and that was the extent of the -- there wasn't

7   really questions; I was explaining what I was looking for.

8   Q    Did he tell you, "Go talk to my lawyer"?

9   A    No.

10  Q    Did he tell you, "I'm not going to talk to you; I'm

11  invoking the Fifth"?

12  A    No.

13  Q    Did he say, "I'm not" -- all you got is name, badge, and

14  serial number.

15  A    I'm sorry; repeat that question?

16  Q    By the way, do you know when his daughter got married?

17  A    I know it was this summer.

18  Q    Okay.  It certainly wasn't 2016, was it?

19  A    No.

20  Q    Okay.  Have you looked at the pretrial report?

21  A    I have not seen it.  I'm not privy to that.

22  Q    Okay.  Do you know that, in fact, that he came back

23  here -- by the way, you've never spoken to anybody, whether

24  it's federal, state, or local, regarding the search warrant

25  that was executed a year ago?

1   A    I spoke to some federal agents about the timing of the

2   search warrant, but I don't know of the substantive nature of

3   it.

4   Q    Did you talk to those -- which -- the federal agents who

5   were involved?

6   A    Not involved, but in this instance an HSI agent got a

7   phone call from CBP on his departure.  And that's the extent of

8   my knowledge.

9   Q    Okay.  Did you ask or did anybody contact you regarding

10  the property that was seized?

11  A    No.  I didn't have anything to do with it.

12  Q    When you say you didn't have anything to do with it, you

13  knew that -- you're -- been involved for two years; is that

14  correct?

15  A    Correct.

16  Q    And it's your testimony here that -- how big is your unit

17  or task force?

18  A    There's four case agents -- five case agents.

19  Q    Five cases?

20  A    Correct.

21  Q    Okay.  And you never paid any attention to a search

22  warrant that was executed on him and his stations and NOIL.

23  A    I paid attention to one piece of the property that they

24  seized.

25  Q    Which was?

Hatcher - Cross / By Mr. Geragos                    51

1   A    A Bugatti.

2   Q    Right.  In fact, didn't you go to his house this morning

3   or didn't you have agents go to his house this morning?

4   A    I did.

5   Q    Yeah.  And you knew where he lived, correct?

6   A    I thought I did.

7   Q    Well, he -- he -- they let you in, they showed you the

8   garage, correct?

9   A    Correct.

10  Q    Okay.  That was the address that the U.S. Attorney just

11  asked you about, wasn't it?  He asked you if you had an

12  address, right?

13  A    I had an address.  Yes.

14  Q    Okay.  Did you go to that address?

15  A    I went to the address that I knew that he lived at, but

16  it's not the same address that he reported when we arrested

17  him.

18  Q    Did you -- by the way, did you know that the -- that there

19  is currently a temporary protective order issued by the judge

20  in the case that you were talking to Mr. Sargsyan's lawyer

21  about?  Did you know about that?

22  A    I am -- I am unaware of that.

23  Q    Okay.  Did you know that -- that Edgar allowed the --

24  well, you didn't do any -- you haven't looked at that case

25  file, have you?

1   A    Which case file?

2   Q    The civil case file of the litigation.

3   A    I have not.

4   Q    Okay.  You just saw a declaration, correct, that you were

5   shown that was marked as an exhibit?

6   A    Correct; Exhibit 6.

7   Q    Right.  What was the paragraph -- what does it say in the

8   paragraph right after the one you read?

9   A    I believe we read paragraph six?  Is that correct?

10  Q    That's correct.  What does paragraph seven say?

11  A    Would you like me to read it?

12  Q    Yes.

13  A    It says:

14             "I am aware Defendant's counsel claims in the motion

15             that I fled the United States because of this" --

16             I'm sorry.  My copy is a little messed up.  I think

17  that says:

18             "-- issuance of a search warrant.  My reasons for

19             reside in Istanbul at this time have nothing to do

20             with the search warrant, and I have not" -- quote,

21             unquote -- "'fled' the United States.  I am currently

22             residing in Istanbul for legitimate business

23             purposes, operating my business and other investments

24             I have in" --

25             I believe that says "several."  My copy is not very

1    good, but:

2            "--several countries."

3    Q    Okay.  Are you aware that almost all of the information

4    you've received regarding Mr. Termendzhyan's flight risk has

5    been generated by Edgar Sargsyan or his lawyer?

6    A    It's not generated by those two sources.

7    Q    That's your -- that's your testimony today, that it's not

8    generated by them?

9    A    Part of it is, but I've spoken to a few more people than

10   that.

11   Q    Okay.  Well, you've spoken to Edgar Sargsyan?  Did you

12   talk to him?

13           **MR. ROLWING:**  I'm going to object to this discovery.

14           **THE COURT:**  It's -- I was just about to say it's

15   getting to the point -- what I -- you know, let's -- let's go

16   directly -- I do realize part of what he is doing is attempting

17   to undermine the credibility of the sources of information, and

18   I'm going to let him continue to do that.

19           **MR. GERAGOS:**  But can you -- I'll -- I'll move on.

20   **BY MR. GERAGOS:**

21   Q    Is there any other witness that you -- you want to name

22   who said that they feel threatened?

23           **THE COURT:**  And I'm not going to --

24           **MR. GERAGOS:**  If you're not going to consider that, I

25   won't get into it.

Hatcher - Cross / By Mr. Geragos                 54

1          **THE COURT:**  Not going to -- yeah, let's -- let's --

2    let's do it this way.  At this point I've heard a lot of

3    evidence and a lot of cross examination on the economic factors

4    and the -- and the potential flight risk.  I don't think I need

5    to consider -- I'm not going to make a decision one way or

6    another on any of -- any danger other than economic at this

7    time.  So --

8          **MR. GERAGOS:**  That's fine.  I'll -- I -- then, I

9    don't need to --

10   **BY MR. GERAGOS:**

11   Q    But do you have -- the tracing that you've done involves

12   130 million; is that correct?

13   A    Over 130 million went to Turkey, yes.

14   Q    Right.  And how much of that came from the gentleman -- or

15   the two gentlemen who were the co-defendants in Utah?

16   A    I -- without my spreadsheets in front of me it's hard to

17   say, but I know that, you know, in -- in 2015 and '16, tens of

18   millions of dollars came from SBK USA or a related company.

19   Q    Tens; not a hundred and thirty.

20   A    No.

21   Q    Correct.  So, a hundred and thirty, you're just taking the

22   Utah monies and you're lumping it in with Mr. Termendzhyan's

23   tens millions.  Is that correct?  Do I have that right?

24   A    When I look at it, it's money from Washakie; it's money

25   from SBK USA; or other money that we've uncovered that goes to

1    Turkey.

2    Q    Right.  What I am asking you, though, is, when you did the

3    tracing, all you've got coming from him going to Turkey is

4    roughly 10 million; isn't that correct?

5    A    When you say "coming from him," that's difficult in the

6    sense that the fraud proceeds were all manufactured, if you

7    will, by joint ventures by both of them.

8    Q    Well, where were the -- when you say the "fraud proceeds,"

9    the proceeds and the indictment -- you're aware of the

10   indictment, correct?

11   A    I am.

12   Q    Okay.  The indictment doesn't allege a conspiracy between

13   the Utah two defendants and Mr. Termendzhyan, does it?

14   A    No, but you asked me what money from Mr. Termendzhyan went

15   to Turkey.

16   Q    Right.  That's what I'm saying.  It was roughly

17   $10 million, wasn't it?

18   A    That's incorrect.

19   Q    Well, it wasn't a hundred and thirty, was it?

20   A    It's over $130 million.

21   Q    From Mr. Termendzhyan?

22   A    From all related parties.

23   A    I'm not asking that question.

24            THE COURT:  Hold on a second.

25            MR. GERAGOS:  I'm asking specific --

Hatcher - Cross / By Mr. Geragos                               56

1        **THE COURT:**  Let me -- let me clear up, because my

2   understanding may be wrong and Mr. Geragos may be right, but my

3   understanding when the agent testified was that the 130 million

4   was traceable to -- either directly to the defendant or to

5   entities that are the defendant-controlled entities, as opposed

6   to Mr. Kingston or one of the others.  So, they may be joint

7   ventures, but -- so, SBK Holdings -- am I correct that that is

8   one of the entities that the Government alleges he has a direct

9   involvement in?

10       **THE WITNESS:**  Correct.

11       **THE COURT:**  Okay.  So, when you say $130 million

12  traceable, you're -- you are tying it to this defendant either

13  directly or through entities that you are saying he has a

14  direct participation in.

15       **THE WITNESS:**  So, the -- it's more than 130.  The

16  130 million is Washakie and SBK Entities.  And without my

17  spreadsheets in front of me, I -- just guessing, I think it's

18  in the neighborhood of 40 to 50 million if we just look at SBK

19  Holdings, USA.

20       **THE COURT:**  And your prior testimony was that those

21  are entities that are very directly connected to the defendant.

22  So, for that 40 million you're talking about this defendant,

23  not something that is, you know, connected only by a -- it was

24  Kingston and he -- we know he has a connection outside of

25  the -- the actual, like, corporate structure.

1          **THE WITNESS:**  That's correct.

2          **THE COURT:**  Okay.

3    BY MR. GERAGOS:

4    Q    But is Washa- -- is it pronounced Washakie?

5    A    It's Washakie.  That's correct.

6    Q    Yes.  Washakie -- is there -- do you have any evidence

7    that that's owned or controlled by Levon Termendzhyan?

8    A    I don't.  He's not -- he doesn't have --

9    Q    It is not, correct?

10   A    Correct.

11   Q    Okay.  Out of the 130 million, how much is that -- how

12   much of that is Washakie?

13   A    I don't understand the question.

14   Q    Well, you said there's 130 million that went out, right?

15   A    Correct.

16   Q    Okay.  How much of that, of that 130, is Washakie?

17   A    Maybe it will be -- maybe it will be better if I explain

18   how it comes in.  The U.S. Treasury pays money to Washakie;

19   Washakie either sends it directly from Washakie to Turkey or

20   they send it to SBK USA and then it goes to Turkey.

21   Q    How much did Washakie send to SBK?

22   A    I believe it's 35 million, roughly.

23   Q    Okay.  And how much did SBK send to Turkey?

24   A    Like I said, I think it's 30 to 40 million.

25   Q    So, if it was 30 to 40 and they only received 35, you're

1   saying it doesn't tie in?

2   A    No, I'm saying he sent some money on his own that didn't

3   come from Washakie.

4   Q    Okay.  So, the only money that he's got that went to

5   Turkey that came from Washakie, if I understand correctly, is

6   roughly 35 million without your tracing charts in front of you.

7   A    Correct.

8   Q    Okay.  So, is it a fair statement that the remainder of

9   the 130 that you testified about to the U.S. Attorney came from

10  Washakie to Turkey?

11  A    Correct.

12  Q    Okay.  So, if we've got 35 million -- by the way, when

13  Washakie sends it to SBK, then Washakie is the one who actually

14  got the credits, correct?

15  A    Are you talking about SBK Turkey or USA?

16  Q    Well, first, when Washakie gets the money, how much do

17  you -- I've heard all these numbers bandied about.  Washakie

18  got how much money?

19  A    Five hundred -- a little over $500 million.  Washakie has

20  no connect -- we have no evidence that that's connected to

21  Mr. Termendzhyan in terms of control, correct?

22  A    Control over the funds?

23  Q    Correct.

24  A    At Washakie that's correct.

25  Q    Okay.  Washakie then sends 35 million to SBK, correct?

Hatcher - Cross / By Mr. Geragos                    59

1   A    That's my recollection, yes.

2   Q    Washakie also sends other funds to other vendors in the

3   U.S., correct?

4   A    In terms of --

5   Q    They pay other bills.

6   A    Correct.  Sure.

7   Q    Okay.  They pay millions of dollars in other bills to

8   other people in America, correct?

9   A    Correct.

10  Q    Okay.  They -- when they pay those bills to the others in

11  America, they pay as much as 10 or 20 million to other people

12  in America, correct?

13  A    Correct.

14  Q    Because they're buying the component parts of what it

15  takes to either produce the 100 or the 99 fuel, correct?

16  A    In many cases they didn't even purchase product, but they

17  did pay some bills, correct.

18  Q    Correct.  Tens of millions of dollars, correct?

19  A    Correct.

20  Q    Okay.  Now, in that case, they don't know -- you're not

21  alleging that the vendors who are getting paid or that the

22  money that's coming from Washakie, you're not alleging that

23  they knew whether or not the tax credits that were received

24  were actually legitimate or illegitimate, are you?

25  A    That was a long question.  I'm not sure where it started.

1          **THE COURT:**  Yeah.  No, and I -- and the Court finds

2   it entirely irrelevant.  What --

3          **MR. GERAGOS:**  Okay.  Well, then the --

4          **THE COURT:**  What's relevant to me, so far, is, you

5   know --

6          **MR. GERAGOS:**  Thirty million dollars.

7          **THE COURT:**  Thirty-five million dollars is a lot of

8   money to most people, and my understanding, at least -- and I

9   want to make sure that I'm clear about this -- is the -- the

10  allegation, you know, based on the -- the scheme that's set

11  forth in the indictment and the testimony I've had today is

12  that at least that 35 million is part of the scheme to defraud

13  and was knowingly funneled through Washakie to SBK and it wound

14  up -- whether or not it's the Government bought something or is

15  available to the defendant, it wound up in Turkey.  Is that a

16  fair statement, or no?

17         **THE WITNESS:**  Correct.  And to continue on with that

18  theory, the total amount paid to Turkey was paid to SBK

19  Turkey -- or to SBK AS in Turkey or its affiliated investments,

20  which Mr. Termendzhyan has a business relationship with.

21         **THE COURT:**  Okay.  So, when you say total amount,

22  that's more than the 35 million?

23         **THE WITNESS:**  That's the 130 plus.

24         **THE COURT:**  The 130 you're -- what you're saying is

25  part of it went through an SBK United States entity and then

1    went to Turkey, and the rest of the 130 million went from

2    something like Washakie --

3              THE WITNESS:  Directly to Turkey.

4              THE COURT:  -- directly to Turkey, but to a Turkish

5    entity that the Government alleges he has an interest in.

6              THE WITNESS:  Correct.

7              THE COURT:  Okay.

8    BY MR. GERAGOS:

9    Q    And you have documents to support that the Turkish entity

10   is controlled by Mr. Termendzhyan?

11   A    We have a lot of witness statements.

12   Q    You don't have any documents, do you?

13             THE COURT:  Yeah, and we're not in a trial now, and

14   we don't need to do that.

15             MR. GERAGOS:  I understand.  I -- they -- we've come

16   a long way from 500 million.  I have no further questions.

17             THE COURT:  Okay.  Very briefly, I would like

18   argument.  Actually, I don't know that I need it, but I am

19   going to give everybody the opportunity to -- to put a circle

20   around things.

21             MR. ROLWING:  Has -- can I ask just a few questions

22   just to wrap it up?

23             THE COURT:  A few.  A few.  They're going to turn the

24   air conditioning off soon --

25             MR. ROLWING:  Oh.

Hatcher - Redirect / By Mr. Rolwing                     62

1          **THE COURT:**  -- and then you're going to want to be

2   gone, let me tell you.

3          **MR. ROLWING:**  That is bad news for me.  I am a

4   particularly hot individual.

5                        **REDIRECT EXAMINATION**

6   BY MR. ROLWING:

7   Q    Have -- has there -- have witnesses informed the

8   Government that Mr. Dermen has admitted to being a partner in

9   SBK AS in Turkey?

10  A    That's correct.

11  Q    And, so, money coming from Washakie from its fraud scheme

12  going to Turkey is going to his partnership in Turkey.

13  A    That's correct.

14         **MR. ROLWING:**  So, your Honor, it might just be 35

15  million that went through SBK.

16  Q    Have you seen other evidence of NOIL sending money

17  directly to SBK?

18  A    I have.

19  Q    Eleven-million-dollar wire in 2016?

20  A    Correct.

21  Q    So, there's not just the 130 million from Washakie that

22  was fraudulently obtained from the IRS, but 35 million and

23  other money that Mr. Termendzhyan has put into Turkey.

24  A    Correct.  And I'm not -- I'm not involved in the financial

25  investigation of Mr. Termendzhyan himself.  I was focused on

                    **EXCEPTIONAL REPORTING SERVICES, INC**

Hatcher - Redirect / By Mr. Rolwing                          63

1   the fraud proceeds from the IRS through Washakie to either

2   Turkey or Mr. Termendzhyan himself.

3   Q    And the 483,000 that Washakie paid to his Turkish bank

4   account at Guaranty Bank didn't go through SBK USA or SBK AS;

5   that was just for his -- the back tax on his mansion, according

6   to the wire, correct?

7   A    Correct.

8   Q    So, there's even more money than what you've described.

9   A    Yes.

10        **MR. ROLWING:**  Your Honor, whether it's 35 million,

11   165 million, or, as the press release, the Republic of Turkey

12   has announced, 500 million since 2013 with a pledge of another

13   450 million, coincidentally, when his co-defendants are

14   applying for another 600 million of tax credits, trying to

15   steal a billion dollars -- whether it's 35, 165, 500 or a

16   billion, it's enough for Mr. Termendzhyan to live the rest of

17   his life.

18   **BY MR. ROLWING:**

19   Q    Did you hear any witness -- have you -- have you --

20        **MR. GERAGOS:**  I don't understand.  Are we doing

21   argument?

22        **THE COURT:**  I thought we were doing argument at this

23   point myself.

24        **MR. GERAGOS:**  Or is this an interactive experience?

25        **THE COURT:**  Yeah.  This is -- thank you, Mr. Geragos.

64

```
 1    I actually -- I think, unless Mr. Geragos has any follow-up
 2    questions, since you had a few, I think we can have the agent
 3    step down now.
 4              Is there any --
 5              MR. ROLWING:  Final question.
 6              THE COURT:  -- anything you want to ask?
 7              MR. GERAGOS:  No.  I mean --
 8              MR. ROLWING:  Final --
 9              THE COURT:  No, no; we're -- we're doing argument
10    now.
11              MR. ROLWING:  Oh.  Okay.
12              THE COURT:  We're doing argument now.
13              Thank you very much for your trademark.
14              THE WITNESS:  Thanks, your Honor.  Do you want me to
15    leave the things up here or take them?
16              THE COURT:  You -- you can just leave them there.
17         (Witness stepped down)
18         (Pause; voices and whispers off the record)
19              MR. ROLWING:  There is no amount of money, no amount
20    of real estate, given these allegations, the evidence that's
21    uncovered, that would assure and should assure this Court that
22    Mr. Termendzhyan will appear.  He -- at the -- at the search
23    warrant he fled to Turkey.  Now he's been indicted and facing
24    significant federal felonies and a continuing investigation, of
25    which he was not aware until Thursday, and he will flee, should
```

1    he be released, to Turkey and live the rest of his days there.

2    So, I submit that we've proved beyond a reasonable -- beyond a

3    preponderance -- I'm sorry; I get used to that -- that he is a

4    flight risk, and I ask this Court to detain him.

5           **THE COURT:**  Mr. Geragos?

6           **MR. GERAGOS:**  Thank you, your Honor.  We've come a

7    long way in the 90 minutes.  We started off with somewhere in

8    the neighborhood of a billion dollars; we then went to 500; we

9    then went to 130; then upon cross examination maybe it's 35,

10   and, by the way, I didn't do a financial investigation.  I get

11   it.

12          **THE COURT:**  It's certainly --

13          **MR. GERAGOS:**  But that isn't the standard.

14          **THE COURT:**  It's certainly enough money that I -- I'd

15   like to win it in Powerball, but --

16          **MR. GERAGOS:**  I -- I -- look, I -- and I think it was

17   Judge Damrell up in Sacramento who once said to me, you know, a

18   million here, a million there, you combine it, pretty soon it's

19   a lot of money.  But the fact of the matter remains; what --

20   and -- and I don't say this facetiously.  I say it because I've

21   had cases like this.  Government lawyers don't seem to

22   understand, especially in cases that involve oil, gas, or

23   commodities and things like that, there is a very narrow margin

24   on these things.  I don't know, and they haven't alleged --

25   and, you know, they can supersede if they want later on -- they

```
 1    haven't alleged that he knew what they were doing with the

 2    credits or anything else.  All they have alleged, as I was

 3    trying to get to towards the end, is that there was outflows

 4    going to pay vendors.  That's what the evidence shows.  If it

 5    wasn't -- if he wasn't Levon Termendzhyan and if this was the

 6    refinery down in Torrance and they were writing a check because

 7    he's the one who's supplying gas or oil to an FBO, they

 8    wouldn't be making this -- this argument.  They had -- and the

 9    agent was candid -- they had two people in their sights.  He

10    is -- I can't emphasize enough.  In fact, the irony of the fact

11    that his last misdemeanor trial that I tried was in front of

12    Judge Mader is -- is beyond ironic, but the -- the -- and was

13    acquitted on one of those counts and acquitted by a jury, he

14    doesn't -- this isn't a man -- he's got a track record of not

15    fleeing.  He doesn't have any incentive to flee.  His kids are

16    here.  His daughter just got married this summer and is living

17    here.  The idea that somehow he's going to flee for -- because

18    of 35 million that went to Turkey is -- is -- I realize it's a

19    lot of money, but we have offered to pledge 25 million in

20    addition to the four that's already sequestered by order of

21    Judge Ferrari.  So, whatever loss they have or claim to have

22    that they need to prove, he's offering dollar for dollar for

23    bail.  I -- and I apologize; I'm not familiar with the form

24    you've got in front of you.  I'm at a disadvantage --

25                THE COURT:  It's actually not in front of me.  It's
```

1  just a --

2  **MR. GERAGOS:**  Yeah.  I'm at a disadvantage on the

3  form.  I will tell you that I'm familiar with the Ninth Circuit

4  standards, as I'm sure you're -- you're much more familiar than

5  me.  But the Ninth Circuit standards, at least when I look at

6  them, just say you've got to have the least restrictive

7  possible.  I'm going to utter it again just so the record is

8  clear.  He will wear a GPS device.  They have already told me,

9  when I spoke to the pretrial officer, that they have that,

10  pretrial, available here in the Central District.  I know for a

11  fact that they do because Navnoor Kang, who was a client of

12  mine, who has just self-surrendered in Morgantown day before

13  yesterday, was allowed by pretrial to travel on the airplane

14  with the GPS device.  That was a person who, by the way, was

15  accused of bribery in the New York state pension fund system.

16  **THE COURT:**  Yeah; that's some other judge.  I

17  don't --

18  **MR. GERAGOS:**  Well, I understand.  I'm just saying in

19  terms of the GPS device.  We've also offered --

20  **THE COURT:**  The GPS device, by the way, is not --

21  it's not a real-time -- oh, suddenly it goes off and they're

22  there to get them right away.

23  **MR. GERAGOS:**  That's why I'm offering -- that's

24  exactly why I'm offering to also -- we have -- we have

25  contacted and we will contract with, as a condition of bail,

68

```
 1    that before he's released, Guidepost -- it's Guidepost
 2    Solutions, who are retired -- all retired law enforcement, FBI,
 3    CIA -- will act as an intermediary to have real-time
 4    supervision of him and report directly to the Court, not to me.
 5    We -- we will have a bail package, as we've indicated to
 6    pretrial, of both property and cash in -- close to $30 million
 7    is what pretrial has -- with a GPS monitor, with an independent
 8    third party whose first obligation is to report to the Court
 9    and supervise.  If the Court is in any way inclined, I would
10    ask the Court to allow me to present that package so that the
11    Court can see it.  It has worked innumerable times in other
12    jurisdictions, and they -- given the fact that he has shown up
13    and has been through this and it's not his first rodeo, and it
14    didn't take very long here to, frankly, damp down what the
15    original allegation that you heard was down to size, I would
16    submit to you that this is something -- not only does he want
17    to fight; I had to tell him to stop talking to me ten times
18    because all he wants to do is fight these allegations.
19            The idea that he's going to flee is just -- I -- and
20    I apologize; I've -- if I'm -- you told me to calm down at one
21    point.  I have known this guy.  When you try a case with a
22    client not once, not twice, but three times, you know somebody
23    and you know whether they're going to flee.  There is no chance
24    of him fleeing.  None.  And there is certainly not going to be
25    a chance of him fleeing if we put up $30 million in property
```

1    and cash, if he's on a GPS, and if he's got 24/7 guards to

2    report to the Court if he so much as steps off of the property.

3    And there is virtually no way to prepare this case with him in

4    custody, with the kind of financial documents, with him getting

5    lost at the Rancho Cucamonga West Valley Detention Center on a

6    daily basis, which is why we're here today and not yesterday --

7    I would submit to the Court all of those things augur for,

8    under the Ninth Circuit standards, bail on these conditions,

9    and I will -- I'd ask that the Court let me present those to

10   you in formalized fashion so that the Court can make what I

11   consider to be -- or comply with the Ninth Circuit law on this

12   matter.

13            **THE COURT:**  I don't need to hear from the Government.

14            I mean, you know, you are one of the most eloquent

15   lawyers that I've, you know, had the -- the pleasure both to

16   litigate against many decades ago -- we haven't seen each other

17   in decades --

18            **MR. GERAGOS:**  I've aged; you haven't, so --

19            **THE COURT:**  No, I have, but you're being nice.

20   But -- and you've incredibly eloquent here, and you do, of

21   course, have recourse both to the district court here or

22   perhaps the district of Utah if that's the way you want to go.

23   And you are absolutely correct about the standard.  That's why

24   the finding of the Court has to be that there are no conditions

25   or combination of conditions.  The issue I have even with the

1   package you propose is, money wise, the -- the amount of money

2   even -- even the very reduced amount that's traceable with the

3   present allegations, even setting aside that there is any

4   continuing investigation going on, is -- you know, it's -- it's

5   sort of like -- sometimes we only need maybe to make a

6   defendant put up a thousand bucks because that thousand bucks

7   is going to, you know, kill their mom if they -- if she has to

8   pay it.  Here the amount of money, the -- and the access is --

9   is concerning.  And the fact is just the -- the fact that he's

10  lived in Turkey, he has said he was residing in Turkey; the

11  proffer, which I don't think was rebutted, was that he has --

12  has not come back to participate in civil proceedings despite

13  court orders -- just on depositions; I'm not talking about

14  skipping on a criminal -- a criminal issue or anything.  The

15  timing of some of his travel is of concern, but not the primary

16  concern of the Court; but, you know, the -- the Government

17  standard is just a preponderance of the evidence here, and so I

18  do find that there are no condition or combination of

19  conditions that would adequately assure that he would, you

20  know, show up for further proceedings here or in Utah because

21  of those strong ties to Turkey, the admitted -- or the evidence

22  of a lot of money in Turkey, and the fact that the Court is

23  relatively certain that if he does manage to make it to Turkey

24  that he is not going to be able to be brought back for

25  proceedings here.

1              I am not going to make a finding on danger to the

2    community at this time.  I am not finding that the Government

3    hasn't met its burden on economic danger.  I told you I wasn't

4    going to even consider the further allegations of -- of --

5    regarding danger or witnesses.  That would be up to the

6    Government to -- to carry its burden on if -- if for some

7    reason there is a need in the future.  So, I am going to make

8    the finding only on flight risk at this -- at this time.

9              So, the -- the question becomes -- I have a waiver of

10   identity in the file, but I don't take those waivers until

11   after I make a finding on detention or bail because sometimes

12   the counsel in the -- and client decide for some reason that

13   they want to put the Government through their paces on whatever

14   else they -- they have to.

15             **MR. GERAGOS:**  Which is what -- that's what we opt

16   for.

17             **THE COURT:**  You opt for scheduling it for an identity

18   hearing?

19             **MR. GERAGOS:**  Correct.

20             **THE COURT:**  Then, we'll go ahead and do that.  I'm

21   going to tell you I'm out of pocket until after the holiday.

22   I'm here tomorrow, but we can't order a defendant back on that

23   quick notice, which -- so, there's going to be some kind of

24   burden on the Government; they're going to have to come back

25   out.  So, we'll set it for an identity hearing.  I can do it

1   the -- August --

2          **MR. GERAGOS:**  Did you say the week -- the following

3   week?

4          **THE COURT:**  No, no, it's this -- the holiday is

5   Monday.

6          **MR. GERAGOS:**  Right.  So, which is --

7          **THE COURT:**  So, I can --

8          **MR. GERAGOS:**  -- the 3rd?

9          **THE COURT:**  We have to pull out the fancy -- we

10  shouldn't have it in court -- iPhone here to look at my court

11  calendar.  Yeah, so I am available to do it on the day after

12  the holiday, on the 4th.  How bad is the -- the -- you know, if

13  we did it in the afternoon?  And, you know, again, it's an

14  identity hearing.  You can have it done by a local AUSA if

15  that -- you know.

16         **MR. ROLWING:**  Special Agent Hatcher (phonetic) is

17  available to identify the defendant right now.  I think he

18  testified he just met him two months ago.

19         **THE COURT:**  It sounded -- it -- yeah, I mean, I --

20  all I would actually need is about, you know, two questions on

21  his booking fingerprints versus, you know, some other case.  I

22  could put him back on right now.  It really does seem -- but,

23  I -- you know, I'm not going to make him -- make him waive, and

24  we didn't set this for an identity hearing, so --

25         **MR. GERAGOS:**  Correct.  Why don't we just set it for

73

1    the 4th.  If I work something out with the U.S. Attorney in the

2    interim we can always take it off calendar, can we not?

3            THE COURT:  If you can work something out, we'll --

4    we'll do that.

5            You know, I didn't -- there was one thing I had meant

6    to state and I didn't when I was making my -- my findings, is I

7    do appreciate the kind of package that you've offered, but

8    know -- I know the realities of what is, you know, actually

9    physically possible from many prior, you know, and -- and more

10   recent hearings, and there really is no real-time way even if

11   he's, you know -- so, what, you -- you would notify the Court

12   at 2:00 o'clock in the morning that, you know, something's

13   happened to his electronic monitoring?  It's just not real-

14   time.  And unless the Government itself is following him

15   around, it's not --

16           MR. GERAGOS:  They --

17           THE COURT:  -- you know, it's --

18           MR. GERAGOS:  They have the ability.  I -- I admit --

19   readily admit I haven't done it in the Central District.  I've

20   done it in the Southern District or co-counsel has done it in

21   the Southern District.  The -- they have the ability; there are

22   third-party -- it's called -- the entity is called Guidepost

23   Solutions.  They do that.

24           THE COURT:  Well --

25           MR. GERAGOS:  They do a 24/7 monitoring, and they not

74

1  only notify the Court, they take -- they act as the same way as

2  a bail agent would.  They've got the authority to do it.  So,

3  that is the -- that's why I would ask that -- if you want to

4  set it for the identity hearing on the 4th, I'd ask you to

5  reserve your decision on detention and let me submit at least

6  that.

7        **THE COURT:**  I'm not going to reserve my -- my

8  decision, because, as I said, you have the -- you know,

9  continuing to put that issue over to my calendar makes no

10  sense.  If you want to -- we've got a more fulsome record than

11  I've had in any identity hearing in the three and a half years

12  I've been on the bench.  I know that's not a long time, but

13  I've had a lot of -- I mean detention hearings.  I've had a lot

14  of detention hearings.  If you think that's the thing that's

15  going to make a difference -- I don't think it is -- then take

16  it to the duty district judge.

17        **MR. GERAGOS:**  I understand.

18        **THE COURT:**  So, I am going to order him detained, and

19  we'll -- you know, and we'll set it for an identity hearing on

20  the 4th.

21        I don't know, you know, Government, if you want to --

22        **MR. GERAGOS:**  Like I said, I --

23        **THE COURT:**  -- you know, pick a time.

24        **MR. GERAGOS:**  -- I'll talk with the Government

25  tomorrow, and I'll talk with local counsel in Utah, as well.

1          **THE COURT:**  All right.  So, let's go ahead and set

2    that for -- if I set it for 2:00 o'clock in the afternoon, you

3    actually could -- if you decide you want to come out, you could

4    come out and go back again on the same day.  I realize that's

5    a -- kind of a pain.

6          **MR. GERAGOS:**  I think -- I hate to speak for the

7    marshal --

8          **THE COURT:**  Hold on.  Hold on a second.

9          **MR. GERAGOS:**  -- but I think they prefer when he's

10   housed at West Valley --

11         **THE COURT:**  Well, hold on a second.  Hold on.

12         **MR. GERAGOS:**  -- that it's a 2:00 o'clock.

13         **THE COURT:**  Oh, Tuesday I have to do it after --

14   after 3:00 p.m. because I -- we share courtrooms, which is why

15   my -- my chambers are on the other side of the --

16         **MR. GERAGOS:**  Far, far away.

17         **THE COURT:**  So, we'd have to set it at 3:00 o'clock.

18   In fact, just to be -- well, he gets off the bench usually

19   earlier than he says he's going to, so we'll set it for

20   3:00 o'clock on -- on the 4th.  I can guarantee you that that

21   identity hearing isn't going to last more than 15 minutes,

22   though, so hopefully you'll either be able to work something

23   out or -- or I, frankly, think it's going to be -- since the

24   agent is here, it's -- I, frankly, think it's going to be a bit

25   of a waste of time and money.

1          **MR. GERAGOS:**  That's why -- that's why I just -- I

2   ask that it be set as a placeholder.  I'd also ask for a

3   medical order.  He's having extreme medical issues, and I'd ask

4   for the Court to order that, as well.

5          **THE COURT:**  Well --

6          **MR. GERAGOS:**  He's being housed at the county

7   facility, which does not have --

8          **THE COURT:**  I need to -- because we have these

9   requests all the time and I can't control either the BOP or the

10  jail, I need a little more than "he's having extreme" -- if you

11  want to clear the courtroom --

12         **MR. GERAGOS:**  He's urinating blood.

13         **THE COURT:**  If -- if -- that's indeed --

14         **MR. GERAGOS:**  And he's had a -- he's had a cardiac

15  event within the last five years; he's had a stent implanted.

16         **THE COURT:**  Okay.  Then, I will --

17         **MR. GERAGOS:**  He's got cardiac issues.

18         **THE COURT:**  I will order that he get seen by the

19  medical staff within -- let's see; what is today?  Today is --

20         **MR. GERAGOS:**  Twenty-eighth.

21         **THE COURT:**  Yeah.  I'm just trying to --

22         **MR. GERAGOS:**  Tuesday.

23         **THE COURT:**  I'm going to order that he be seen by the

24  medical personnel by the end of the week.

25         And, Ms. Carson, let's make sure that we -- if we

1    have to, we'll -- we'll talk to -- you know, contact

2    San Bernardino directly.  Sometimes it takes a while for the

3    order if he's not being housed in MDC to get where it needs to

4    go.

5            And that that -- that's -- it's not a medical report

6    that you want the Government -- want the Court to see, right?

7    You just want it -- okay.

8            **MR. GERAGOS:**  No.  I just want him examined.

9            **THE COURT:**  Okay.  He -- he'll -- he is to be

10   examined based on the -- the proffer of what sounds like a

11   pretty severe medical condition by the end of the week.

12           All right.  Given that we are perhaps going to see

13   each other again, the only other issue -- and, so, I am going

14   to order him, obviously, remanded at this time, but not to be

15   transported until after either an agreement of the parties

16   or -- or if -- if the Court indeed finds that he is the person

17   named in the indictment, then I don't think we have anything

18   left to do today.

19           **MR. GERAGOS:**  No.  Thank you, your Honor.

20           **THE COURT:**  All right.

21           **MR. ROLWING:**  Thank you, your Honor.

22           **THE COURT:**  All right.  And -- and I do want to thank

23   everybody both for their patience, and the argument was really

24   good today, and -- but I -- like I said, I'm not sure I've ever

25   had an almost two-hour detention hearing before in my

existence.

     (Proceeding was adjourned at 6:16 p.m.)


**CERTIFICATION**


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



_____                    September 7, 2018
         Signed                                                              Dated


*TONI HUDSON, TRANSCRIBER*